William C. Wilson, SBN: 149683
Kim S. Cruz, SBN: 177406
Ryan G. Canavan, SBN: 313990
WILSON GETTY LLP
12555 High Bluff Drive, Suite 270
San Diego, California 92130
Telephone:  858.847.3237
Facsimile:   858.847.3365
Attorneys for Defendant SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS
HEALTHCARE CENTER (erroneously sued and served as separate entities)

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME GONZALEZ, individually and as Successor in Interest to the Estate of Santiago Gonzalez, deceased; JORGE GONZALEZ; AMERICO GONZALEZ; MARISUSI RODRIGUEZ; RAMONA RODRIGUEZ; ROBERTO GONZALEZ; TARCILA REVELES; and SANTIAGO GONZALEZ,<br><br>              Plaintiffs,<br><br>vs.<br><br>REDWOOD SPRINGS HEALTHCARE CENTER; SPRUCE HOLDINGS, LLC; and DOES 1 to 50, inclusive,<br><br>              Defendants. | Case No.<br><br>[Removal from Superior Court of California, County of Tulare, Case No. VCU283547]<br><br>**DEFENDANT, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446** |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA:**

PLEASE TAKE NOTICE AND NOTICE IS HEREBY GIVEN THAT Defendant Spruce Holdings, LLC dba Redwood Springs Healthcare Center (erroneously sued and served as separate entities, and hereinafter referred to as "Redwood Springs") hereby removes this action from the Superior Court of the State of California, County of Tulare to the United States District Court for the Eastern District of California.  Removal is

based on federal officer jurisdiction and federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, 1442 (a)(1), and 1446. Defendant Spruce Holdings, LLC dba Redwood Springs Healthcare Center reserves all defenses and objections to venue based on 42 U.S.C. §247d-6d(e)(1).

In support of this Notice of Removal, Defendant Spruce Holdings, LLC dba Redwood Springs Healthcare Center states as follows:

## I.   PLEADINGS

1.     On or about July 15, 2020, Plaintiffs commenced this action in the Superior Court of the State of California for the County of Tulare, entitled *Jamie Gonzalez, Individually and as Successor in Interest to the Estate of Santiago Gonzalez, deceased; Jorge Gonzalez; Americo Gonzalez; Marisusi Rodriguez; Ramona Rodriguez; Roberto Gonzalez; Tarcila Reveles; and Santiago Gonzalez v. Redwood Springs Healthcare Center, et. al.,* Case No. VCU283547.  Pursuant to 28 U.S.C. §1446(a), true and correct copies of all process, pleadings and orders served on Redwood Springs in the Superior Court action are attached hereto as Exhibit 1.

2.     Plaintiffs, Jaime Gonzalez, Jorge Gonzalez; Americo Gonzalez; Marisusi Rodriguez; Ramona Rodriguez; Roberto Gonzalez; Tarcila Reveles;  and Santiago Gonzalez, children of Decedent Santiago Gonzalez, allege as his heirs and Jaime Gonzalez alleges as successor in interest to decedent, Santiago Gonzalez that Mr. Gonzalez was a resident at skilled nursing facility, Redwood Springs Healthcare Center during the time relevant to the Complaint.  (See Exhibit 1- Complaint, pg. 1-2, ¶s 1-3; and Complaint, pg.3, ¶ 8.)

3.     Plaintiffs allege that due to the wrongful acts and omissions of Defendant, including deficiencies with respect to infection control, the use of personal protective equipment ("PPE") and COVID-19 testing, decedent, Santiago Gonzalez became infected with COVID-19 during his residency at Redwood Springs,  and died due to the virus on April 10, 2020. (See Exhibit 1- Complaint, pg. 4, ¶ 11; pg. 4, ¶13; Pg. 5, ¶ 14; pg.  5-6, ¶ 16.)  Plaintiffs allege causes of action for Elder Abuse, Willful Misconduct

and Wrongful Death against Defendant, Redwood Springs.   (See Exhibit 1- Complaint, pg. 1, pgs. 9-12, ¶s 29-45; pgs. 12-14, ¶s 46-54, and pg. 14, ¶s 55-60).

## II.     THE PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN MET

4.     Defendant, Redwood Springs was served on July 29, 2020.   Plaintiffs' counsel granted Defendant a one-week extension in which to serve a response to the Superior Court Complaint.  Thus, pursuant to this extension, Defendant's response to the Complaint was due September 4, 2020.  (See Exhibit 2)

5.     Defendant, Redwood Spring's Notice of Removal is timely under 28 U.S.C. §1446(b) as this Notice has been filed by September 4, 2020.

6.     Removal to the United States District Court for the Eastern District of California, Robert E. Coyle Federal Courthouse in Fresno, California, is proper because the Complaint was filed in the Superior Court of the State of California for the County of Tulare, which is located within the jurisdiction of this District.   See 28 U.S.C. § 1441(a); and 28 U.S.C. § 84(c)(2).

7.     Pursuant to 28 U.S.C. §1446(d), a copy of this Notice of Removal is being served on Plaintiffs, and a copy is being filed with the Clerk of the Court for the Superior Court of the State of California for the County of Tulare.

## III.     REMOVAL IS PROPER BECAUSE THIS COURT HAS JURISDICTION UNDER THE FEDERAL OFFICER STATUTE

8.     Removal is proper under 28 U.S.C. §1442(a)(1), which provides for removal when a Defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under §1442(a)(1), when the removing defendant establishes that:

(a)     Defendant is a "person";

(b)     Defendant was acting under the direction of a federal officer when it engaged in the allegedly tortious conduct;

1

2

(c)   There is causal nexus between the Plaintiffs' claims and the Defendant's actions under federal direction; and

3

(d)  Defendant has raised a colorable defense based upon federal law.

4

5

6

7

See *Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017).   Courts have a duty to broadly interpret § 1442 in favor of removal, which "should not be frustrated by a narrow, grudging interpretation" of the statute. *Id*. at pg. 1244 [quotations and citations omitted.]

8

9

10

11

12

13

14

15

9.   This statute creates removal jurisdiction even as to cases that otherwise could not be commenced in or removed to federal court (e.g., common law negligence action against government driver who lives in same state as plaintiff; hence no diversity). *Jefferson County, Ala. v. Acker* (1999) 527 US 423, 431; *Mir v. Fosburg* (9th Cir. 1980) 646 F.2d 342, 344 Moreover, unlike the usual rule that removability in federal question cases must appear on the face of a well-pleaded complaint, cases may be removable under §1442(a) when a federal officer or agency raises a "colorable federal defense" See *Jefferson County, Ala. v. Acker*, supra, 527 US at 431.

16

17

18

19

20

10.   Here, Redwood Springs' satisfies all elements for removal under §1442(a)(1). Defendant is a "person" for the purpose of the federal officer.  The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; See also *Goncalves*, 865 F.3d at 1244.

21

22

23

24

25

26

27

11.   Defendant was also acting under the direction of a federal office when it engaged in the alleged tortious conduct. The United States Supreme Court has held that the phrase "acting under" involves "an effort to *assist*, or help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos*., 551 US 142, 152 (2007); see also In re *Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457 (3rd. Cir. 2015) The "acting under" requirement is broad and is to be liberally construed.  *Watson*, 551 US at pg. 147.

28

///

12. "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Cf. Bakalis v. Crossland Savings Bank,* 781 F.Supp. 140, 144-145 (E.D.N.Y. 1991)   ('The rule that appears to emerge from the case law is one of 'regulation plus ...'.")." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) "This control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'" See *Fung v. Abex, Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

13. Defendant meets the "acting under" prong for removal based on the federal officer statute. Here, Plaintiffs contend that the acts and omissions of Defendant with respect to their response to the COVID-19 pandemic caused decedent, Santiago Gonzalez, to contract the virus and led to his death therefrom.

14. Prior to the current national pandemic, regulation of nursing homes was very general in nature.  In 1987, Congress enacted legislation, known as the Nursing Home Reform Act, requiring nursing homes participating in Medicare and Medicaid to comply with certain quality of care rules and regulations. See 42 U.S.C. § 1396r, 42 U.S.C. §1395i-3 and 42 C.F.R. § 483.1 through 42 C.F.R. §483.95.  The Centers for Medicare and Medicaid Services, contracts with state surveyors, including the California Department of Public Health in California ("CDPH"), to perform federal surveys to ensure that facilities accepting Medicare and Medicaid (Medi-Cal) payments comply with federal laws and regulatory requirements.  Generally, and prior to the pandemic, these surveyors conducted site visits to evaluate whether facilities are in compliance with federal requirements and regulations. See 42 U.S.C. § 1395aa; and 42 CFR § 488.10.  If CDPH surveyors found a "deficiency" in a facility's compliance with federal regulations, CDPH would issue a deficiency or citation, and on occasion use the CMS enforcement remedy of a "directed plan of correction," under which the facility would

develop and submit a plan of correction, which would then be forced on behalf of CMS by CDPH.

15.     In January, 2020, in response to the pandemic and the national state of emergency, CMS and the CDC, began issuing detailed directives to healthcare facilities as part of the coordinated national effort to respond to and contain the COVID-19 pandemic.   CDPH surveyors, contracted by CMS, were supervising skilled nursing facilities with respect to all aspects of infection control and the pandemic response and ensuring strict compliance with the CMS directives.   This was in contrast to the role of CMS before the pandemic.   Prior to the pandemic, the focus was on ensuring compliance with existing regulation.   However, throughout the pandemic, CMS specifically instructed facilities to take or not take particular clinical and operational actions in the absence of finding deficiencies that would otherwise require the facility to develop its own plan of correction.  These directives included the following:

A.     Early directives to skilled nursing facilities focused on monitoring residents and staff for symptoms and protecting healthcare providers from infection due to contact with symptomatic patients.  Facilities were advised to adhere to standards for infection prevention and take steps to prepare for COVID-19.

B.     On January 17, 2020, the CDC advised healthcare providers to immediately notify the infection control personnel at their facility and their local or state health department in the event they were evaluating a patient under investigation ("PUI"). State health departments in turn were instructed to immediately contact the CDC and complete a PUI case investigation form.  Initially, COVID-19 testing was conducted solely through the CDC. CDC assisted local/state health departments in the collection, storage and shipment of specimens to the CDC.

C.     On February 1, 2020, the CDC issued an "Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus" to provide guidance to state and local health departments and healthcare providers regarding 2019-nCoV 2019 (the 2019 Novel Coronavirus, now known as COVID-19).   ***The guidance was part of the***

*"ongoing US public health response . . . to identify and contain [the] outbreak and prevent sustained spread of 2019-nCoV in the United States"* and addressed infection prevention and control specific to 2019-nCoV. [Emphasis added.] This document provided directives related to screening of patients in healthcare facilities, and coordination with local health departments for testing and reporting of results.  In the update, the CDC set forth the criteria for assessing patients for COVID-19, and advised that patients who meet the criteria should be asked to wear a surgical mask as soon as they are identified and evaluated in a private room with the door closed, ideally an airborne infection isolation room if available.  Healthcare personnel entering the room were directed to use standard precautions, contact precautions, airborne precautions and eye protection.  Persons with a confirmed or suspected COVID-19 infection who were hospitalized were to be evaluated and cared for in a private room with the door closed, ideally an airborne infection isolation room.

D.    On February 6, 2020, CMS took direct action to prepare healthcare facilities for the national response to the emerging 2019 Novel Coronavirus by issuing a Memorandum to State Survey Agency Directors.  The memo stated that "[e]very Medicare participating facility in the Nation's healthcare system must adhere to standard for infection prevention and control." CMS directed healthcare staff to "comply with basic infection control practices" including standard, contact and airborne precautions, and "adhere to CDC recommendations on standard hand hygiene practices."  It provided very specific instructions with respect to hand hygiene and instructed facilities to have "PPE measures and protocols" in place.

E.    On March 4, 2020, CMS issued a Memorandum regarding Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in nursing homes. Facilities were instructed to screen visitors for international travel, symptoms of respiratory infection, and contact with someone with or under investigation for COVID-19, and to restrict entry of visitors who meet this criteria.  Facilities were advised to screen staff for the criteria as well, and that staff who meet the criteria should not report

to work. The CMS guidance also included directions as to when to transfer a resident with a suspected or confirmed COVID-19 infection to a hospital, and under what conditions a nursing home may accept patients diagnosed with COVID-19.   CMS advised facilities to follow the available CDC guidance.   Defendant followed these directives and the directives issued prior to this, in an effort to assist and help carry out the CDC and CMS' goal of containing and responding to the pandemic.

F.   On March 8, 2020, the CDC issued further Updated Guidance on Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19). The CDC advised that with expanding spread of COVID-19, additional areas of geographic risk were being identified and the criteria for considering testing were being updated to reflect this spread.   The Update indicated that additional COVID-19 testing was becoming available in clinical laboratories pursuant to FDA Emergency Use Authorizations.   With increased access to testing, the criteria for testing had been expanded to include more symptomatic persons. Thus, as part of the coordinated national effort to control and mitigate the spread of the pandemic, the CDC had been specifically directing which persons could be tested.   The March 8, 2020 updated guidance, also provided detailed instructions for the collecting of specimens.

G.   On March 10, 2020, CMS issued a Memorandum updating the instructions for health care workers involved in the care of patient with known or suspected COVID-19.   The memo addressed the supply, allocation and use of PPE utilized to prevent the spread of the virus including facemasks, respirators, eye protection, medical gowns, gloves and airborne infection isolation rooms. Specifically, the CDC had updated the PPE recommendation for healthcare workers involved in the care of patients with known or suspected COVID-19 and that the recommendations would be considered by CMS surveyors to determine if providers were complying with infection control protocols.   The memo advised that facemasks were acceptable temporary alternative when the supply chain of respirators could not meet demand. Healthcare providers were advised that available respirators should be prioritized for

procedures that are likely to generate respiratory aerosols, which pose the highest exposure risk to healthcare providers.  The March 10, 2020, CMS memo also provided that in the event of a shortage of medical gowns, gowns should also be prioritized for aerosol generating procedures, and that patients with known or suspected COVID-19 should be cared for in a single-person room with the door closed.  Airborne infection isolation rooms were to be reserved for patients undergoing aerosol generating procedures.

H.     On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency. Following this proclamation, the CDC and CMS took swift action to waive restrictions and expand capacity for healthcare providers and suppliers to coordinate the national response to the nationally declared state of emergency. On March 13, 2020, CMS issued revised infection control and prevention directives for nursing homes to prevent the transmission of COVID-19.   In the Memo, facilities were ordered to restrict visitation of all visitors and non-essential health care personnel, cancel communal dining and all group activities, implement  active screening of residents and staff for fever and respiratory symptoms, screen all staff at the beginning of their shift for fever and respiratory symptoms, and identify staff that work at multiple facilities and actively screen and restrict them to ensure they do not place individuals in the facility at risk for COVID-19.   Additional direction was provided regarding patient transfers and acceptance of patients with COVID-19.   Facilities were ordered to continue to follow applicable CDC guidelines.

I.     On March 17, 2020, the CDC issued documents containing instructions to optimize the supply of eye protection, isolation gowns, N95 respirators and face masks.  The documents provided a series of options and specific directives relating to the use PPE based on whether the facility was in conventional capacity (normal operation), contingency capacity (experiencing temporary expected PPE shortages), or crisis capacity (involving periods of known PPE shortages necessitating strategies that are no commensurate with standard U.S. standards of care).

SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL
OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

J.     On March 20, 2020, CMS issued a memo entitled Prioritization of Survey Activities.  In the memo, CMS advised that CMS surveyors would be conducting targeted infection control surveys of providers identified in collaboration with the CDC and the HHS Assistant Secretary for Preparedness and Response to ensure providers are implementing actions to protect the health and safety of individuals to respond to the COVID-19 pandemic. A skilled facility would be subject to citation, and fines for failure to implement the directives from CMS.  **Thus, the directives from CMS (which followed and instructed facilities to follow the CDC guidance) were truly mandates**, not recommendations.

K.     On March 21, 2020, the CDC issued further guidance specifically aimed at long term care facilities entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes."  In this publication, nursing homes were advised to restrict visitation, restrict all volunteers and non-essential healthcare personnel, cancel group activities and communal dining, implement active screening of residents and healthcare providers for fever and respiratory symptoms, and make PPE available in areas where resident care is provided and place a trash can near the exit inside the resident's room so staff can discard PPE prior to exiting.  The CDC further directed that "residents with known or suspected COVID-19 do not need to be placed in an airborne infection isolation room (AIIR) but should ideally be placed in a private room with their own bathroom.  Room sharing might be necessary if there are multiple residents with known or suspected COVID-19.  As roommates of symptomatic residents might already be exposed, it is generally not recommended to separate them in this scenario."

L.     On April 2, 2020, CMS issued new guidelines in accordance with the recent CDC directives, which were aimed at long-term care facilities to "mitigate the spread" of COVID-19.  In doing so, CMS noted that "[i]n recent weeks, *CMS and CDC, at President Trump's direction have worked together to swiftly issue unprecedented targeted direction to the long-term care facility industry, including a general prohibition of visitors implemented on March 13, 2020, as well as strict infection*

***control and other screening recommendations.***" [Emphasis added.]  CMS further noted that long term care facilities were to immediately implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers, vendors, etc.) entering long term care facilities.  On April 2, 2020, CMS ordered facilities to comply with all CMS and CDC guidance related to infection control.  CMS ordered facilities to ensure all staff are using appropriate PPE when interacting with residents to the extent PPE is available and per CDC guidance on the conservation of PPE, and to use separate staffing teams for COVID-19 positive residents to the best of their ability.

16.    In summary, through the federal directives issued by the CDC, CMS, and the CDPH surveyors contracted by CMS, federal authorities were making the operational decisions as it related to the clinical pandemic response in skilled nursing facilities. Facilities were ordered to restrict visitation, cancel communal dining, implement active screening and staff for fever and respiratory symptoms, screen staff at the beginning of their shift for fever and respiratory symptoms and actively take their temperature and document the absence of shortness of breath and any new or change in cough and sore throat.   Facilities were instructed on which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19. These very detailed clinical directives and instructions represented a marked departure from the regulatory structure which existed before the pandemic.

17.    At all relevant times Redwood Springs was acting at the specific direction of federal authorities to address the on-going federal effort and national state of emergency to contain the COVID-19 pandemic, and prevent the spread of the virus.   All actions taken by Redwood Springs in preparation for and response to the COVID-19 pandemic, were taken "in an effort to assist, or help carry out, the duties or tasks" as ordered by the CDC and CMS, and CDPH surveyors (per the contract with CMS), and performed pursuant to the direct orders and comprehensive and detailed regulations

SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL
OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

issued by CMS.  Redwood Springs was acting at the direction of the federal government to prevent, treat and contain COVID-19 at the facility.

18.     Next to establish removal under the federal officer statute, Defendants must show "a causal nexus between the plaintiff's claims and the defendant's actions under federal direction." *Winters v. Diamond Shamrock Chemical Co*., 149 F.3d 387, 398 (5th Cir. 1998).

19.     Here, Defendant, Redwood Springs' response to the COVID-19 pandemic as it relates to the claims of Plaintiffs (i.e., the care and treatment of Santiago Gonzalez) was directly related to the orders and directives issued by the federal government. There is a clear causal nexus between the claims against Defendant and the actions taken by Defendant at the direction of the federal government including, but not limited to, the direction of CDC, CMS, as well as by representatives of the State Survey Agency, acting under contract with CMS, with respect to the response to the pandemic at the facility and the administration of care to Santiago Gonzalez. Plaintiffs' Complaint alleges deficiencies in infection control, the use of PPE by facility staff and COVID-19 testing.  (See Exhibit 1- Complaint, pg. 4, ¶11-13, pg. 5, ¶, 14, pgs.  5-6, ¶ 16, pg. 7, ¶ 21, pg. 12, ¶ 47, pg. 13, ¶ 50.)  The nexus element is met as Defendant was following the orders/directives of CMS with regard to infection control, COVID-19 testing and the use of PPE.

20.     Lastly, Redwood Springs meets the final requirement as it intends to assert colorable federal defenses.   For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statue is to secure the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The colorable federal defense element is met where a defendant alleges its actions were justified as the defendant was complying with federal directives with respect to the alleged wrongful acts. See *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127.  See also *Rural Community Workers Alliance v. Smithfield*, 2020 WL 2145350 (W.D. Mo.) finding that compliance

-12-

with federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil liability.) (See Exhibit 3 hereto) Here, Defendant was complying with Federal directives and regulations issued by CMS, the CDC, and CDPH, the CMS contracted state surveyors, in responding to all aspects of the COVID-19 pandemic.

21.     As a colorable defense, Defendant, Redwood Springs, also asserts immunity under the Public Readiness and Emergency Preparedness Act ("PREP Act") as set forth at 42 U.S.C. 247d-6d(a)(1).   This Act provides for immunity of "covered persons" from "suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of covered countermeasure" provided there has been a declaration issued by the Secretary of Health and Human Services with respect to such countermeasure.   On March 10, 2020, United States Health and Human Services Secretary Alex M. Azar issued a Declaration invoking the PREP Act for the COVID-19 pandemic.     The Declaration was effective as of February 4, 2020. (See Exhibit 4 hereto).   Defendant is a "covered persons" under the act.

22.     Under the PREP Act and Secretary Azar's initial Declaration, the "covered countermeasures" include any qualified pandemic or epidemic product; and any drug, biologic product or device.  A "qualified pandemic or epidemic product" is defined as a drug, biologic product or device, which is a product manufactured, used, designed, developed,  modified, licensed or procured to diagnose, mitigate, prevent, treat or cure a pandemic or epidemic; or to limit the harm such pandemic or epidemic might otherwise cause.  Secretary Azar's Declaration also included as covered countermeasures "any antiviral drug, any biologic, any diagnostic, any other device or any vaccine used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product. . ."

23.     In the initial Declaration, Secretary Azar declared that "Administration of Covered Countermeasures means physical provision of the countermeasures to

recipients, *or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures*." [Emphasis added.]

24.     Secretary Azar subsequently issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020.  (See Exhibit 5 hereto) The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act.  In the Amendment, the Secretary stated that "any respiratory protective devices approved by NIOSH . . . is a priority for use during the public health emergency that [the Secretary] declared on January 31, 2020 .  . . for the entire United States to aid in response of the nation's health care community to the COVID-19 outbreak."

25.     On June 4, 2020, Secretary Azar further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020. (See Exhibit 6 hereto)

26.     Plaintiffs' Complaint alleges deficiencies with respect to COVID-19 testing and in the use of PPE by facility staff.  (See Exhibit 1- Complaint, pg. 4, ¶11-13, pg. 5, ¶ 14, pgs.  5-6, ¶ 16, pg. 7, ¶ 21, pg. 12, ¶ 47, pg. 13, ¶ 50.)  The allegations in this action relate to Defendant's administration or use of "qualified pandemic products" used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause including PPE and COVID-19 testing kits.  Thus, the claims in Plaintiffs' Complaint relate to "covered countermeasures" under the PREP Act, which qualify for and trigger immunity from liability for the claims in this action.   The applicability of the PREP Act is further addressed below in detail.

27.     Removal to federal court is proper in this case, as Defendant has established that all elements for removal under the federal officer statute have been met.

///

**IV.    JURISDICTION EXITS UNDER 28 U.S.C. §1331 (FEDERAL QUESTION)**

28.    Plaintiffs' Complaint alleges that due to the wrongful acts and omissions of Defendant, including deficiencies in the use of personal protective equipment ("PPE") and COVID-19 testing, decedent, Santiago Gonzalez became infected with COVID-19 during his residency at Redwood Springs, and died due to the virus on April 10, 2020. (See Exhibit 1- Complaint, pg. 4, ¶11-13, pg. 5, ¶, 14, pgs.  5-6, ¶ 16, pg. 7, ¶ 21, pg. 12, ¶ 47, pg. 13, ¶ 50.)   Such allegations relate to Defendant's administration or use of qualified pandemic products used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause including NIOSH approved respiratory protective devices (facemasks) and COVID-19 testing kits. The claims fall under the PREP Act, the applicability of which presents a significant Federal Question relating to the ongoing national emergency and COVID-19 pandemic.

29.    The Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d and 247d-6e (2006) (the "PREP Act"), along with the Declarations of United States Health and Human Services Secretary Alex M. Azar, are federal statutes that apply to healthcare providers and skilled nursing facilities, such as Defendant, with respect to the administration of countermeasures to diagnose, treat, prevent and mitigate the spread of COVID-19.

30.    As Plaintiffs have alleged a claim which is preempted under a federal statute, this Court has original jurisdiction pursuant to 28 U.S.C. §1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."   Federal courts have "jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action *or* that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif*., 463 US 1, 27-28 (1983); *Dennis v. Hart* 724 F.3d 1249, 1253 (9th Cir. 2013) *Rivet v. Regions Bank of Lousiana*, 522 US 470, 475

1   (1998).

2        31.    "[A] state claim may be removed to federal court in only two

3   circumstances—when Congress expressly so provides . . . or when a federal statute

4   wholly displaces the state-law cause of action through complete pre-emption.  When the

5   federal statute completely pre-empts the state-law cause of action, a claim which comes

6   within the scope of the scope of that cause of action, even if pleaded in terms of state

7   law, is in reality based on federal law."  *Beneficial National Bank v. Anderson*, 539 U.S.

8   1, 8 (2003).

9        32. Complete preemption exists when the preemptive force of federal law is so

10  powerful that it displaces any state law cause of action, and leaves room only for a

11  federal claim for purposes of the "well-pleaded complaint" rule. *Metropolitan Life Ins.*

12  *Co. v. Taylor* (1987) 481 US 58, 63-64.  Complete preemption exists when (1) the

13  statute relied upon by defendant as preemptive contains civil enforcement provisions

14  within the scope of which plaintiff's state law claims fall; and (2) there is a "clear

15  indication of Congressional intention to permit removal despite the plaintiff's exclusive

16  reliance on state law." *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R.*

17  *Co.* 858 F2d 936, 942 (3rd Cir. 1988) citing *Franchise Tax Bd. of State of Calif. v.*

18  *Construction Laborers Vacation Trust for Southern Calif., supra,* 463 U.S. 1, 24.

19       33.    Here, Plaintiffs' claims are preempted by the PREP Act.  Under the PREP

20  Act, Congress has provided an exclusive remedy and exclusive federal jurisdiction for

21  the substance of the allegations and relief sought in the Complaint thereby preempting

22  State law with respect to the claims raised in the Complaint. Moreover, Defendant's

23  administration of countermeasures, such as the use of facemasks and other PPE, and

24  COVID-19 testing, to diagnose, treat, prevent or mitigate the spread of COVID-19

25  which forms the basis of this action, presents a federal question under the PREP Act

26  giving this Court original jurisdiction preempting the state claims asserted by Plaintiffs

27  in the Complaint.

28  ///

-16-

SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL
OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

34.    The PREP Act provides liability protections for pandemic and epidemic products.   The legislation empowers the Secretary of Health and Human Services to issue a declaration providing immunity for "covered persons" to suits and liability under federal and state law with respect to claims relating to the administration of a "covered countermeasure" during a health emergency.  42 U.S.C. §§ 247d-6d(a)(1).  Specifically, 42 U.S.C. 247d-6d(a)(1) provides as follows: "Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure."

35.    On March 10, 2020, United States Health and Human Services Secretary Alex M. Azar issued a Declaration invoking the PREP Act for the COVID-19 pandemic. The Declaration was effective as of February 4, 2020. See Exhibit 4 to Defendants' RFJN.   Secretary Azar subsequently issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020.  See Exhibit 5 to Defendants' RFJN. The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act.  On June 4, 2020, Secretary Azar further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020. See Exhibit 6 to Defendants' RFJN.

36.    The PREP Act is applicable with respect to a "covered countermeasure," which definition includes: "(1) a qualified pandemic or epidemic product (as defined in § 247d-6d (i) (7)) .  .  . or (4) a respiratory protective device that is approved by the National Institute for Occupational Safety and Health ("NIOSH") and that the Health and Human Service Secretary determines to be a priority for use during a public health

emergency declared under section 247d." 42 USC § 247d-6d (i) (1). A "qualified pandemic or epidemic product" is defined as: a drug, biologic product or device that is:

> "(A)(i) a product manufactured, used, designed, developed, modified, licensed, or procured—
>> (I) to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or
>> (II) to limit the harm such pandemic or epidemic might otherwise cause;
>
> (ii) a product, manufacture, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious of life-threatening disease or condition caused by a product described in clause (i); or
>
> (iii) a product or technology intended to enhance the use or effect of a drug, biologic product, or device described in clause (i) or (ii); and
>
> (B)(i) approved or cleared under chapter V of the Federal Food, Drug, and Cosmetic Act or licensed under section 262 of this title;
>
> (ii) the object of research for possible use as described in subparagraph (A) and is the subject of an exemption under section 505(i) or 520(g) of the Federal Food, Drug, and Cosmetic Act; or
>
> (iii) authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug and Cosmetic Act."

See 42 USC § 247d-6d (i)(7).

37.    Robert P. Charrow, General Counsel for the Department of Health and Human Services Office of the Secretary, issued an omnibus advisory opinion to address questions and concerns regarding the scope of the PREP Act immunity for the COVID-19 pandemic.  The Opinion summarized the requirements to meet the definition of a qualified pandemic or epidemic product noting that the product:

> (1) must be used for COVID-19; and
> (2) must be
>> (a) approved, licensed, or cleared by FDA
>> (b) authorized under an EUA [emergency use authorization];
>> (c) described in an EUI [emergency use instructions]; or
>> (d) used under either an Investigational new Drug (IND) application or an Investigational Device Exemption."

See Advisory Opinion attached as Exhibit 7 to Defendants' RFJN, pg. 4.

38.     Moreover, attached as Appendix A to this Advisory Opinion is a list of the "covered countermeasures" for which emergency use authorizations have been issued by the United States Food and Drug Administration.  See Exhibit 8 to Defendants' RFJN. The list includes twelve pages of COVID-19 test kits, and provides that face shields, gowns, shoe covers, non-surgical isolation gowns, surgical caps, properly labeled non-surgical masks, and certain non-NIOSH approved respirators are covered by an EUA. Surgical masks are not listed; however, such masks are Class II medical devices which are cleared by the FDA for use.   (See 21 CFR 878.4040).  Thus, COVID-19 testing kits, face masks, gowns, gloves and other PPE are "qualified pandemic or epidemic products" and "covered countermeasures" under the PREP Act, as such products are either FDA cleared/approved or are included in an EUA.

39.     Immunity under the PREP Act is afforded to "covered persons" which include a person or entity that is a "program planner" of a covered countermeasure, and/or a qualified person who prescribed, administered, or dispensed such countermeasure. Under the Act, "person" includes "an individual, partnership, corporation, association, entity, or public or private corporation." 42 U.S.C. §247d-6d (i)(2) and (5).  The term "program planner" includes persons/entities "who supervised or administered a program with respect to the administration, dispensing, . . . provision, or use of a . . . qualified pandemic product or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a [HHS Secretary's] declaration . . . ."   42 U.S.C. §247d-6d (i)(6).

40.     A private sector employer or other person can be a "program planner" when it carries out prescribed activities.  (See Ex. 4-March 10, 2020 Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, Federal Register, Vol. 85, No. 52, pg. 15199.)  Robert Charrow, General Counsel for the Office of the Secretary of the Department of Health and Human

-19-

Services, also recently issued a letter which provides that a "senior living community" meets the definition of a "program planner" to the extent that it supervises or administers a program with respect to the administration, dispensing, distribution, provision or use of a qualified pandemic or epidemic product, including the provision to a facility to administer or use a covered countermeasure. See Exhibit 9 to Defendants' RFJN.

41.     Redwood Springs qualifies as a "covered person" under the PREP Act.  At the time of the allegation set forth in the FAC, Redwood Springs was acting as a "program planner" and "qualified person."  Redwood Springs is a skilled nursing facility licensed by the California Department of Public Health, which employs licensed nursing personnel, including Registered Nurses and Licensed Vocational Nurses, who are authorized to prescribe, administer, or dispense the covered countermeasures set forth in Plaintiffs' Complaint (i.e., PPE including facemasks, gloves, gowns, face shields, N95 masks, and COVID-19 testing) under the laws of the State of California.  Additionally, Redwood Springs is a program planner that was supervising and administering a program with respect to the administration, dispensing, provision and use of qualified pandemic and epidemic products.

42.     Immunity under the PREP Act "applies to **any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the** . . .  distribution . . . **purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure**." [Emphasis added.] 42 USC § 247d-6d (a)(2)(B).

43.     Plaintiffs' claims arise out of Defendant's use, distribution, procurement and administration of covered countermeasures/qualified pandemic products (including COVID-19 testing kits, NIOSH approved respiratory protective devices and other PPE) used to diagnose, mitigate, prevent, treat or cure the COVID-19 virus, or to limit the harm COVID-19 might otherwise thereby triggering application of the PREP Act.

44.     In his initial March 10, 2020 Declaration, HHS Secretary Azar notes that the "PREP Act does not explicitly define the term 'administration' but does assign the

-20-

Secretary the responsibility to provide relevant conditions in the Declaration."   In Section IX of the Declaration, Secretary Azar defines "administration of a covered countermeasure" as the "physical provision of the countermeasures to recipients ***or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients***; ***management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures.***" [Emphasis added.]

45.   Plaintiffs' claims involve activities and decisions directly related to the delivery, distribution and dispensing of countermeasures to recipients and the management and operation of Defendant's covered countermeasures program, including decisions as to how best to optimize supplies of PPE and utilize COVID-19 testing kits in light of known regional and national shortages.   The broad definition of "administration of a covered countermeasure" set forth in Secretary Azar's declaration encompasses Defendants' plans and decisions with respect to how best to utilize and optimize supplies of PPE and COVID-19 testing kits, and whether and when the use of such countermeasures is appropriate.

46.   Defendants have thus established that they have immunity under the PREP Act as it relates to Plaintiffs claims that Defendant failed to utilize PPE and delayed in testing Mr. Gonzalez for COVID-19.

47.   The PREP act was designed to apply to individuals and entities responding to public health emergencies, and provides immunity for claims involving "covered countermeasures" under the Act.   The sole exception to the immunity from suit and liability (other than actions by and against the United States) provided by the Act, is "for an exclusive Federal cause of action against a covered person for death or serious injury proximately caused by willful misconduct."   42 U.S.C. §§247d-6d(d)(1) and (e)(1).

48.   The statute sets forth the procedures for suit, which must be filed in the US District Court for the District of Columbia. 42 U.S.C. §247d-6d(e)(1), including requirements for pleading with particularity, verification of and submission of physician

declaration in support of the Complaint, and assignment of the action to a three-judge panel which shall have jurisdiction to consider motions to dismiss, and motions for summary judgment. Moreover, §247d-6d(e)(10), the "*United States Court of Appeals for the District of Columbia Circuit shall have jurisdiction of an interlocutory appeal by a covered person taken within 30 days of an order denying a motion to dismiss or motion for summary judgment based on an assertion for the immunity from suit conferred by subsection (a) or based on an assertion of the exclusion under subsection (c)(5)*." [Emphasis added.]

49.     The PREP Act also expresses its clear intention to preempt state control of the issues raised by Defendants, and explicitly provides as follows:

> "During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
> (A) is different from, or is in conflict with, any requirement applicable under this section; and
> (B) relates to the . . . distribution, sale, donation, purchase . . . or the prescribing, dispensing or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter. . . "

50.     The Court in *Parker v. St. Lawrence County Public Health Dept*., 102 A.D.3d 140 (N.Y. App. Div. 2012) addressed the issue of Federal preemption for PREP Act claims and correctly found that federal law did preempt the plaintiff's state law claims for negligence and battery arising from the administration of the H1N1 vaccine without consent.   The Court in *Parker* ruled that the PREP Act contained an express preemption clause and that this plain reading was the best evidence of Congress' intent with regard to preemption.  *Id*.  The Court found that the clear language that "no State . . . . may establish, enforce, or continue in effect with respect to a covered countermeasure

1   any provision of law or legal requirement that . . . (A) is different from, or is in conflict

2   with, any requirement applicable under this section; and (B) relates to the . . . use, . . .

3   dispensing, or administration by qualified persons of the covered countermeasure." *Id*.

4   The Court reasoned that "[s]ince State regulations can be as effectively exerted through

5   an award of damages as through some form of preventative relief, state common-law tort

6   claims may be preempted along with State statutes and regulations. *Id*. at 143, citing

7   *Riegel v. Medtronic, Inc.*, 552 U.S. at 324 (2008).  Finally, the Court concluded that

8   "Congress intended to preempt all state law tort claims arising from the administration

9   of covered countermeasures by a qualified person pursuant to a declaration by the

10  Secretary" and that this extended beyond mere administration to include questions of

11  informed consent. *Id*.   Even though the Secretary's Declaration for H1N1 was more

12  narrowly drafted than the COVID-19 declaration, the *Parker* court still found

13  preemption.

14       51.   The plain language of the PREP Act, and supporting case law, make clear

15  that complete preemption and exclusive federal jurisdiction exists for this matter. A state

16  court has no jurisdiction to hear or consider the claims which relate to covered

17  countermeasures under the PREP Act.  Not only has Congress expressed a clear intent to

18  provide immunity from civil liability for covered persons involved in the administration,

19  use and distribution of covered countermeasures, but Congress further set up civil

20  enforcement provisions with exclusive federal jurisdiction which provide a specific

21  federal forum for actions arising from alleged "willful misconduct" and the rules for

22  adjudicating such claims.   Under the PREP Act, Congress has provided an exclusive

23  remedy for Plaintiffs' claims and the relief sought in the Complaint thereby preempting

24  State law with respect to the claims raised in the Complaint.  Plaintiffs' Complaint

25  therefore invokes a federal question and Plaintiffs state law claims are completely

26  preempted under the PREP Act.  Removal is therefore proper under 28 U.S.C. §§ 1331,

27  and 1441(a).

28  ///

# V.   THIS CASE RAISES A SUBSTANTIAL AND IMPORTANT FEDERAL ISSUES REQUIRING THE COURT TO RETAIN JURISDICTION

52.   Federal jurisdiction is further appropriate as this state action "arises under" federal law and raises a substantial federal issue.  See *Grable & Sons Metal Products. v. Darue Enginerring & Manufacturing*, 545 U.S. 308 (2005).  The applicability of the PREP Act poses a substantial federal issue which would serve to clarify and determine vital issues of federal law. Federal question jurisdiction over state law claims may be sustained if the claims present a substantial, imbedded question of federal law. *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 808 (1986).  In *Grable & Sons Metal Products v. Darue Engineering & Mfg*, 545 U.S. 308 (2005), the United States Supreme Court held that removal is appropriate if (1) the state law claim necessarily raises a disputed and substantial issue; and (2)  a federal court may entertain the claims without disturbing federal/state comity principles. *Id.* at 314.

53.   Here, Defendant satisfies both prongs under *Grable*.  This case involves issues of national importance, which present issues of first impression.  While Plaintiffs do allege State causes of action, their claims relate to the Defendant's response to a national public health state of emergency, which has not been seen by this Country in over a century.  The healthcare response to this pandemic was coordinated at a national level by the Department of Health and Human Services, the CDC, the FDA and CMS, and entailed the issuance of detailed directives to healthcare providers to identify and sequester infected patients, which patients under investigation were to be tested, and the use of personal protective equipment. All cases positive for COVID-19 were reported to the CDC, and initially all testing was conducted solely through the CDC. Plaintiffs' Complaint raises issues with respect to the procurement, use, allocation, distribution and administration of PPE and COVID-19 testing, which invoke a substantial federal question regarding the extent to which the broad immunities afforded under the PREP Act apply to the conduct of Defendant.

///

54.     The application of the PREP Act raises a substantial federal issue which is disputed.  The allegations in the Complaint arise out of Defendant's response to the COVID-19 pandemic and are inextricably intertwined with and invoke the PREP Act and the Declarations of the Health and Human Services Secretary.  The Federal Court has a substantial interest in determining the application of the PREP Act in this matter. The PREP Act and its triggering immunity, has been invoked in exceptionally rare circumstances since it was enacted in 2005.  The PREP Act and HHS Secretary Azar's declarations confer a broad and sweeping immunity to individuals and entities fighting the COVID-19 pandemic during this declared state of emergency.  The unique character of the COVID-19 virus, the present lack of a vaccine, as well as its high communicability required Secretary Azar to set forth an expansive declaration covering broad categories of measures to fight the pandemic including COVID-19 testing and PPE, all of which require interpretation as to the scope and application.  Thus, there can be no doubt that there is a substantial and compelling interest for the PREP Act and the Secretary's declaration to be interpreted by the Federal Courts. Moreover, the Federal Court is uniquely and properly positioned to interpret Congressional intent and interests of the federal government.

55.     This case also satisfies the second prong set forth in *Grable*. The Court would not "disturb any congressionally approved balance of federal and state judicial responsibilities" by retaining jurisdiction in this matter.  The PREP Act expresses a strong federal interest and a clear intention to supersede or preempt state control of the issues raised by Plaintiffs' Complaint.

56.     Congress did not intend the application of PREP Act immunity to be decided by State Courts.  As such, this Court would not be disturbing or infringing on any balance of State and Federal judicial responsibilities by retaining jurisdiction.  To the contrary, the plain language of the statute seeks to assert broad federal authority over the issues arising under the Act, and seeks to eliminate all semblance of State Court control.

1       WHEREFORE, Defendant, Spruce Holdings, LLC dba Redwood Springs

2   Healthcare Center, having established that this case is properly removed to Federal

3   Court, Defendant provides notice pursuant to 28 U.S.C. §1446, that the action pending

4   in the Superior Court of the State of California County of Tulare, Case No. 283547, is

5   properly removed to the United States District Court for the Eastern District of

6   California, and respectfully requests that this Court exercise jurisdiction over this case.

7   Should Plaintiffs file a Motion to Remand this action, Defendant requests an opportunity

8   to oppose the Motion and more fully respond in a supplemental memorandum.

9

10

11   Dated:  September 4 , 2020                    WILSON GETTY LLP

12

13                                         By: _/s/ Kim S. Cruz_____

14                                              William C. Wilson
                                                Kim S. Cruz
15
                                              Attorneys for Defendant SPRUCE HOLDINGS,
16                                            LLC dba REDWOOD SPRINGS
                                              HEALTHCARE CENTER (erroneously sued and
17                                            served as separate entities)

18

19

20

21

22

23

24

25

26

27

28

**SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL
OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

*Jamie Gonzalez, individually and as SII to the Estate of Santiago Gonzalez, deceased, et. al. v. Redwood Springs Healthcare Center, et. al.*
**United States District Court, Eastern District of California**
**Case No.**
**\*\*\***
**PROOF OF SERVICE**

I am employed in San Diego County.  I am over the age of 18 and not a party to this action.  My business address is 12555 High Bluff Drive, Suite 270, San Diego, California 92130.

On **September 4, 2020**, I served the foregoing documents, described in this action as:

- **DEFENDANT, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

As follows:

Warren R. Paboojian, Esq.
Jason S. Bell, Esq.
Baradat & Paboojian, Inc.
720 West Alluvial Avenue
Fresno, CA 93711
T: 559.431.5366
F: 559.431.1702
Email: wrp@bplaw-inc.com
Email: jsb@bplaw-inc.com

**[X]    By CM/ECF ELECTRONIC DELIVERY:**    In accordance with the registered case participants and in accordance with the procedures set forth at the Court's website www.ecf.cacd.uscourts.gov.

**[X]**    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **September 4, 2020** at San Diego, California.

_____
Tonya Jamois