1

William C. Wilson, SBN: 149683
bwilson@wilsongetty.com

2

Kim S. Cruz, SBN: 177406
kcruz@wilsongetty.com

3

Ryan G. Canavan, SBN: 313990
rcanavan@wilsongetty.com

4

WILSON GETTY LLP

5

12555 High Bluff Drive, Suite 270
San Diego, California 92130

6

Telephone:  858.847.3237
Facsimile:   858.847.3365

7

Attorneys for Defendant SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE

8

CENTER (erroneously sued and served as separate entities)

9

10

**UNITED STATES DISTRICT COURT**

11

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| JAIME GONZALEZ, individually and as Successor in Interest to the Estate of Santiago Gonzalez, deceased; JORGE GONZALEZ; AMERICO GONZALEZ; MARISUSI RODRIGUEZ; RAMONA RODRIGUEZ; ROBERTO GONZALEZ; TARCILA REVELES; and SANTIAGO GONZALEZ, | Case No. 1:20-cv-01260-NONE-EPG **DEFENDANT, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND** |
| Plaintiffs, | Complaint Filed: July 15, 2020 |
| vs. | Date:  November 2, 2020 Time:  9:30 a.m. Courtroom: #4 |
| REDWOOD SPRINGS HEALTHCARE CENTER; SPRUCE HOLDINGS, LLC; and DOES 1 to 50, inclusive, | |
| Defendants. | |

13

14

15

16

17

18

19

20

21

22

23

24

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

25

Defendant, Spruce Holdings, LLC dba Redwood Springs Healthcare Center, hereby submits the

26

following Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion to Remand.

27

///

28

///

This Opposition is based on the Memorandum of Points and Authorities, the Declaration of Kim S. Cruz, Esq., the concurrently filed Request for Judicial Notice and exhibits attached thereto, the pleadings filed herein, and any other such oral and/or documentary evidence or argument which may be presented at, before, or during the hearing on Plaintiffs' Motion to Remand.

Dated:  October 19, 2020                          WILSON GETTY LLP


By: _/s/ Kim S. Cruz_____

William C. Wilson
Kim S. Cruz

Attorneys for Defendant SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER

-2-

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………….. i

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

    I.      INTRODUCTION ........................................................................................................... 1

    II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS ......................................................... 3

    III.    THIS COURT HAS JURISDICTION UNDER THE FEDERAL OFFICER REMOVAL STATUTE ................................................................................................... 4

          A.     Defendant was "Acting Under" the Direction of a Federal Officer ................... 5

          B.     There is a Causal Nexus Between Plaintiffs' Claims and the Actions taken by Defendant Pursuant to Federal Direction ............................................... 12

          C.     Defendants have Raised a Colorable Defense Based on Federal Law ............... 13

          D.     This Court is not Bound by the Orders issued in *Maglioli* and *Martin* .............. 14

    IV.    PLAINTIFFS' CLAIMS FALL WITHIN THE PROVISIONS OF THE PREP ACT AND THE DECLARATION OF THE HEALTH AND HUMAN SERVICES SECREATY INVOKING THE ACT FOR THE COVID-19 PANDEMIC ................................................................................................................... 14

    V.     REMOVAL IS APPROPRIATE AS FEDERAL COURTS HAVE EXCLUSIVE JURISDICTION UNDER THE PREP ACT ................................................................... 21

    VI.    THIS CASE RAISES A SUBSTANTIAL AND IMPORTANT  FEDERAL ISSUES REQUIRING THE COURT TO RETAIN JURISDICTION .......................... 23

    VII.   CONCLUSION ............................................................................................................. 25

**CASES**

*Bakalis v. Crossland Savings Bank,* 781 F.Supp. 140, 144-145 (E.D.N.Y. 1991) ................................. 6

*Casablanca v. Mount Sinai Medical Center*, No. 112790/10, 2014 WL 10413521 (N.Y. Sup. Ct. 2014) ...................................................................................................................................................... 19

*Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457 (3rd. Cir. 2015) ........................................................................................ 6

*Dennis v. Hart*  724 F.3d 1249, 1253 (9th Cir. 2013) ..................................................................... 5, 21

*Estate of Maglioli v. Andover Subacute Rehab* 2020 Lexis 145055 (D. N.J. August 12, 2020) ........... 14

*Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 397, n. 2 (1981) ..................................... 20

*Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif.*, 463 US 1, 27-28 (1983) ...................................................................................................................... 21

*Fung v. Abex, Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992) ............................................................. 6

*Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017) ................... 4, 5

In *Grable & Sons Metal Products v. Darue Engineering & Mfg*, 545 U.S. 308 (2005) ....................... 23

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457, 466 (3rd. Cir. 2015) ........................................................................... 4

*Jackson v. Big Blue Healthcare*, 2020 Lexis 150018 (D. KS. August 19, 2020) ................................ 14

*Jefferson County, Ala. v. Acker* (1999) 527 US 423 ............................................................................. 5

*Lutz v. Big Blue Healthcare*, 2020 Lexis 150018 4815100 (DC Kansas August 19, 2020) ................. 18

*Martin v. Serrano Post Acute, LLC*, 2020 Lexis 165874 (C.D. Ca. September 10, 2020) .................... 14

*Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 808 (1986) ......................................... 23

*Metropolitan Life Ins. Co. v. Taylor* (1987) 481 US 58, 63-64 ........................................................... 21

*Mir v. Fosburg* (9th Cir. 1980) 646 F.2d 342, 344 ............................................................................... 5

*Parker v. St. Lawrence County Public Health Dept.*, 102 A.D.3d 140 (N.Y. App. Div. 2012) ............ 22

*Peterson v. Blue Cross/Blue Shield of Texas,* 508 F.2d 55, (5th Cir. 1975) ........................................ 2, 4

*Riegel v. Medtronic, Inc.*, 552 U.S. 312, 324 (2008) .......................................................................... 23

*Rivet v. Regions Bank of Lousiana*, 522 US 470, 475 (1998) ................................................... 5, 20, 21

*Rural Community Workers Alliance v. Smithfield*, 2020 WL 2145350 (W.D. Mo. 2020) .................... 13

*Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) .................................................... 6

*Swan v. Community Relations-Social Development Commission*, 374 F.Supp 9, 11 ( (E.D. Wisc.1974) 5

*Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994) ............................................................. 13

*Watson v. Philip Morris Cos.*, 551 US 142, 152 (2007) ................................................................. 6

*Williams v. Williams*, 427 F.Supp. 557, 563 (D. Maryland 1976) .............................................. 4

*Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ....................................................................... 13

*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998) ................................ 12

**STATUTES**

28 U.S.C. § 1331 ............................................................................................................................. 20

28 U.S.C. §1442(a)(1) ...................................................................................................................... 4

42 U.S.C. § 1395aa .......................................................................................................................... 6

42 U.S.C. § 1396r ............................................................................................................................ 6

42 U.S.C. §§247d-6d(d)(1) and (e)(1) ........................................................................................... 21

42 U.S.C. §1395i-3 .......................................................................................................................... 6

42 U.S.C. §247d-6d (i)(2) and (5) .................................................................................................. 17

42 U.S.C. §247d-6d(a)(1) ............................................................................................................... 15

42 U.S.C. §247d-6d(b)(1) ............................................................................................................... 19

42 U.S.C. §247d-6d(e)(1) ............................................................................................................... 22

42 U.S.C. 247d-6d(a)(1) ................................................................................................................. 14

42 USC § 247d-6d (a)(2)(B) ........................................................................................................... 17

42 USC § 247d-6d (i) (1) ................................................................................................................ 15

42 USC § 247d-6d (i)(7) ................................................................................................................. 16

42 USC §247d-6d(a)(2)(B) ............................................................................................................. 20

PREP Act, 42 U.S.C. §§ 247d-6d ........................................................................................... *passim*

**REGULATIONS**

21 CFR 878.4040 ............................................................................................................................ 16

42 C.F.R. § 483.1 through 42 C.F.R. §483.95 ................................................................................. 6

42 CFR § 488.10 .............................................................................................................................. 6

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

This case involves the death of Santiago Gonzalez, who contracted COVID-19 during his admission to Redwood Springs Healthcare Center, and died on April 10, 2020. Plaintiffs' Complaint alleges that Defendant, Spruce Holdings, LLC dba Redwood Springs Healthcare Center ("Redwood Springs") failed to protect Mr. Gonzalez from contracting COVID-19, an acute respiratory disease caused by the SARS-CoV-2 betacoronavirus or a virus mutating therefrom. See March 10, 2020 Declaration of Health and Human Services Secretary Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 attached as Exhibit "A" the concurrently filed Request for Judicial Notice ("RFJN").

On September 4, 2020, Defendant removed this action to Federal Court on two grounds: (1) federal officer jurisdiction on the grounds that Defendant was acting at the specific direction and oversight of the federal government, including the Department of Health and Human Services, the Centers for Medicare and Medicaid Services ("CMS") and the Center for Disease Control and Prevention ("CDC"), to address the on-going federal effort and national state of emergency to contain the COVID-19 pandemic; and (2)  federal question jurisdiction based on the Public Readiness and Emergency Preparedness Act ("PREP Act"), under which the federal court has exclusive federal jurisdiction for Plaintiffs' claims. [See Docket item 1- Notice of Removal]

Plaintiffs now challenge the Federal Court's jurisdiction in this matter.  This case involves issues of national importance and first impression.  While Plaintiffs do allege State causes of action, their claims relate to Defendant's response to a national public health state of emergency, which has not been seen by this Country in over a century.  The healthcare response to this pandemic was coordinated at a national level by the Department of Health and Human Services, the CDC, the FDA and CMS, and entailed the issuance of detailed and evolving instructions to skilled nursing facilities to direct their response to the pandemic. This is not a case where Defendant was simply complying with existing law and regulations.  Instead, through extensive federal directives by the CDC, CMS and the California Department of Public Health ("CDPH") as the agents of the CMS, federal authorities were making the real-time operational decisions as it related to the pandemic response in skilled nursing

facilities. These directives were updated regularly as more was learned about COVID-19 and its transmission. Facilities were directed as to which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19. Additionally, skilled nursing facilities were ordered to restrict visitation, cancel communal dining, implement active screening and staff for fever and respiratory symptoms, screen staff at the beginning of their shift for fever and respiratory symptoms and actively take their temperature and document the absence of shortness of breath and any new or change in cough and sore throat.  The issues pertaining to the alleged acts and omissions of Defendant, while acting under the direction of the federal government are properly tried in Federal Court. *Peterson v. Blue Cross/Blue Shield of Texas,* 508 F.2d 55, (5th Cir. 1975)

In addition, to the strong grounds for removal under the Federal Officer statute, removal is appropriate based on federal preemption and federal question jurisdiction under the PREP Act.  This case presents important federal issues as it pertains to the scope and interpretation of the PREP Act and Health and Human Services Secretary Azar's declarations invoking the Act for the COVID-19 pandemic.  Plaintiffs urge this Court to read the PREP Act as narrowly as possible.  However, such a reading would undermine the Congressional intent to have this statute read as broadly and comprehensively as possible.  Congress enacted the PREP Act to provide immunity to front line healthcare workers who deploy covered measures to treat patients and save lives without the fear of lawsuits.

Though the Complaint alleges State causes of action, there is little else about this case that involves issues of state law.  It is now up to this Court to determine whether the applicability and scope of the PREP Act should be decided by the State court with virtually no federal case law to guide it, and whether Plaintiffs should be permitted to avoid the applicability of the PREP Act simply by omitting any reference to this Act in their Complaint or by characterizing the claim as one involving a "failure to act."

Plaintiffs' Complaint directly places at issue Redwood Spring's manner of use and administration of covered countermeasures, such as testing kits, face masks, gloves and other personal

1   protective equipment, and the administration of its infection control program which implements these

2   countermeasures.   The Declaration of HHS Secretary Azar makes clear that for the public health

3   emergency declared for COVID-19, healthcare providers have immunity under the PREP Act for all

4   claims relating to "decisions directly relating to . . . . [the] dispensing of countermeasures to recipients;

5   [and the] management and operation of countermeasures programs." This encompasses Defendant's

6   infection control program and its decision with respect to how best to utilize and optimize supplies of

7   PPE and COVID-19 testing kits.

8        The PREP Act further expresses a clear intention to provide for federal preemption and

9   exclusive federal jurisdiction over the claims relating to covered countermeasures deployed in a public

10  health emergency bringing this case within the jurisdiction of the federal court.

11       Defendant submits that the issues presented in this case require a federal forum.  This case was

12  properly removed to Federal Court and the Court should maintain jurisdiction over this matter.

13  **II.  SUMMARY OF PLAINTIFFS' ALLEGATIONS**

14       This case involves the death of Santiago Gonzalez.  Plaintiffs' allege that Mr. Gonzalez death

15  on April 10, 2020 was due to the COVID-19 virus, which he contracted during his admission to

16  Redwood Springs. (See Plaintiffs' Complaint, pg. 1, ¶ 1.) Plaintiffs assert causes of action for  (1) Elder

17  Abuse; (2) Willful Misconduct; and (3) Wrongful Death.

18       In their Complaint, and based on information and belief, Plaintiffs allege that prior to April 3,

19  2020, Defendant knew, or should have known, that the elderly population was vulnerable to becoming

20  deathly ill if infected with COVID-19.  Despite this knowledge and the safety procedures and protocols

21  being issued by the local, state and federal governments to help prevent the spread of COVID-19,

22  Defendant, either did not implement the safety procedures or negligently failed to follow and monitor

23  and/or disregarded such procedures. (Complaint, ¶ 16.)

24       The Complaint sets forth that on or about April 3, 2020, Santiago Gonzalez tested positive for

25  COVID-19. Plaintiffs contend that Santiago Gonzalez and other patients at the facility contracted

26  COVID-19 due to Defendants' failure to properly and adequately care for and protect the elderly

27  patients in their care. (Complaint, ¶ 13.) On April 10, 2020, Plaintiffs were notified that Mr. Gonzalez

28  had passed away. Plaintiffs contend that Mr. Gonzalez' death was the result of Defendants' failure to

act, care for, protect and assist him. (Complaint, ¶ 14.)

Plaintiffs' allegations can be summarized as falling into the following categories:    (1) Failure to provide and ensure proper use of PPE to mitigate the spread of COVID-19 at the facility; (2) Failure to timely administer a COVID-19 test to Mr. Gonzalez; (3) Failure to isolate COVID-19 positive residents to prevent spread of the virus at the facility; (4) Failure to monitor staff for infection and prevent infected staff and individuals from entering the facility; (5) Failure to adequately clean and disinfect the facility; and (6) Failure to report changes in Mr. Gonzalez' condition to the attending physician and his family.

### III.   THIS COURT HAS JURISDICTION UNDER THE FEDERAL OFFICER REMOVAL STATUTE

Removal is proper under 28 U.S.C. §1442(a)(1), which provides for removal when a Defendant is sued for acts undertaken at the direction of a federal officer. The purpose of the removal statute is to prevent persons acting under the direction of a federal officer from being tried in state courts for acts or omissions undertaken at the direction of the federal government. *Peterson v. Blue Cross/Blue Shield of Texas,* 508 F.2d 55, (5th Cir. 1975).

Plaintiffs argue that allegations of a "failure to act pursuant to federal authority cannot form the basis of a jurisdictional argument that the defendant acted pursuant to federal authority."  Plaintiffs argument, however, has no support in law. The federal officer statute provides for removal of actions based on claims of "any alleged failure of action or nonaction" by a federal officer.  *Williams v. Williams*, 427 F.Supp. 557, 563 (D. Maryland 1976).

Courts have a duty to broadly interpret § 1442 in favor of removal, which "should not be frustrated by a narrow, grudging interpretation" of the statute. *Id.* at pg. 1244 [quotations and citations omitted.] *Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017). Unlike the general removal statute, the federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457, 466 (3rd. Cir. 2015).

This statute creates removal jurisdiction even as to cases that otherwise could not be commenced in or removed to federal court (e.g., common law negligence action against government

driver who lives in same state as plaintiff; hence no diversity). *Jefferson County, Ala. v. Acker* (1999) 527 US 423, 431; *Mir v. Fosburg*, 646 F.2d 342, 344 (9th Cir. 1980).

Plaintiffs contends that removal jurisdiction under the federal officer statute is determined from the face of the Complaint, and cite *Rivet v. Regions Bank of Louisiana*, 522 US 470, 475 (1998) and *Dennis v. Hart*, 724 F.3d 1249 (9th Cir. 2003) in support of this contention. *Rivet v. Regions Bank of Louisiana* and *Dennis v. Hart,* however, involved removal under §1441, not §1442, and are therefore inapplicable to any analysis regarding the propriety of removal under the federal officer statute. "Generally speaking the limitations on removal under §1441[1] are not applicable to removal under §1442." *Swan v. Community Relations-Social Development Commission*, 374 F.Supp 9, 11 ( (E.D. Wisc.1974). "[T]his is in keeping with congressional policy, for while Congress has gradually restricted the right of removal under the general statute, it has broadened the special right of removal for federal officers for acts performed under color of office. " *Id*. citing Moore's Federal Practice PO.164(1) at 827 (2d ed. 1965). Unlike the usual rule that removability in federal question cases must appear on the face of a well-pleaded complaint, cases may be removable under §1442(a) when a federal officer or agency raises a "colorable federal defense" See *Jefferson County, Ala. v. Acker*, 527 US at 431.

Removal is appropriate under §1442(a)(1), when the removing defendant establishes that: (1) Defendants are persons;  (2) Defendants were acting under the direction of a federal officer when it engaged in the allegedly tortious conduct; (3)  There is causal nexus between the plaintiff's claims and the defendant's actions under federal direction; and (4)  Defendants have raised a colorable defense based upon federal law. *Goncalves,* 865 F.3d  at 1244 (9th Cir. 2017).

## A.  Defendant was "Acting Under" the Direction of a Federal Officer

Here, Plaintiffs dispute that Defendant was "acting under" a federal officer as required to establish federal court jurisdiction under §1442(a)(1).   However, Plaintiffs ignore the unprecedented

---

[1]  28 USC §1441 addresses removal of civil actions based on diversity of citizenship and claims which arise under the Constitution, laws, or treaties of the United States. 28 USC §1442 is the federal officer removal statute.

1   control and direction the federal government exercised over skilled nursing facilities with respect to the

2   response to the COVID-19 pandemic.

3        The United States Supreme Court has held that the phrase "acting under" involves "an effort to

4   *assist*, or help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos*., 551

5   US 142, 152 (2007); see also *In re Commonwealth's Motion to Appoint Counsel Against or Directed to*

6   *Defender Association of Philadelphia*, 790 F.3d 457 (3rd. Cir. 2015)  The "acting under" requirement

7   is broad and is also to be liberally construed.  *Watson*, 551 US at pg. 147.

8        "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that

9   the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's

10  direct orders or to comprehensive and detailed regulations.  *Cf. Bakalis v. Crossland Savings Bank,* 781

11  F.Supp. 140, 144-145 (E.D.N.Y. 1991)  ('The rule that appears to emerge from the case law is one of

12  'regulation plus ...'.")." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) "This

13  control requirement can be satisfied by strong government intervention and the threat that a defendant

14  will be sued in state court 'based upon actions taken pursuant to federal direction.'"  See *Fung v. Abex,*

15  *Corp*., 816 F. Supp. 569, 572 (N.D. Cal. 1992). The "acting under" requirement is met when Defendant

16  is acting pursuant to detailed and ongoing instructions from a federal officer.  *Winters v. Diamond*

17  *Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998).

18       Prior to the current national pandemic, regulation of nursing homes was very general in nature.

19  In 1987, Congress enacted legislation, known as the Nursing Home Reform Act, requiring nursing

20  homes participating in Medicare and Medicaid to comply with certain quality of care rules and

21  regulations. See 42 U.S.C. § 1396r, 42 U.S.C. §1395i-3 and 42 C.F.R. § 483.1 through 42 C.F.R.

22  §483.95.  The Centers for Medicare and Medicaid Services, contracts with state surveyors, including

23  the California Department of Public Health in California, to perform federal surveys to ensure that

24  facilities accepting Medicare and Medicaid (Medi-Cal) payments comply with federal laws and

25  regulatory requirements.  Generally, and prior to the pandemic, these surveyors conducted site visits to

26  evaluate whether facilities are in compliance with federal requirements and regulations. See Exhibit

27  "B" to Defendants' RFJN; also see 42 U.S.C. § 1395aa; and 42 CFR § 488.10.   If CDPH surveyors

28  found a "deficiency" in a facility's compliance with federal regulations, CDPH would issue a

deficiency or citation, and on occasion use the CMS enforcement remedy of a "directed plan of correction," under which the facility would develop and submit a plan of correction, which would then be forced on behalf of CMS by CDPH.

In January, 2020, CMS and the CDC, began issuing detailed directives to healthcare facilities as part of the coordinated national effort to respond to and contain the COVID-19 pandemic.  CDPH surveyors contracted by CMS, were supervising skilled nursing facilities with respect to all aspects of infection control and the pandemic response and ensuring strict compliance with the CMS directives.  This was in contrast to the role of CMS before the pandemic.  Prior to the pandemic, the focus was on ensuring compliance with existing regulation.  However, throughout the pandemic, CMS specifically instructed facilities to take or not take particular clinical and operational actions in the absence of finding deficiencies that would otherwise require the facility to develop its own plan of correction.

Early directives to skilled nursing facilities focused on monitoring residents and staff for symptoms.  Facilities were advised to adhere to standards for infection prevention and take steps to prepare for COVID-19.   See CMS Memorandum QSO 20-09-ALL entitled Information for Healthcare Facilities Concerning 2019 Novel Coronavirus attached as Exhibit "C" to Defendants' RFJN.

Initially, diagnostic testing for COVID-19 could only be conducted through the CDC.  On January 17, 2020, healthcare providers were advised to immediately notify the infection control personnel at their facility and their local or state health department in the event they were evaluating a patient under investigation ("PUI"). State health departments in turn were instructed to immediately contact the CDC and complete a PUI case investigation form.  The CDC assisted local/state health departments in the collection, storage and shipment of specimens to the CDC.  See CDC's Criteria to Guide Evaluation of Patients Under Investigation (PUI) for 2019-n-CoV dated January 17, 2020 attached as Exhibit "D" to Defendants' RFJN.

On January 31, 2020, HHS Secretary Azar declared that COVID-19 represented a national health emergency and that such state of emergency had existed since January 27, 2020.  (See Exhibit "E" to RFJN -Determination of Public Health Emergency.

On February 6, 2020, CMS issued a Memorandum to all healthcare facilities advising facilities to adhere to standards for infection prevention and control and to adhere to CDC recommendations on

-7-

standard hygiene practices, using alcohol-based hand sanitizer. CMS further encouraged the review of appropriate PPE use and availability (gloves, gowns, respirators and eye protection). See Exhibit C to Defendants' RFJN.

On February 28, 2020, the CDC issued a Health Update and Interim Guidance on the Outbreak of Coronavirus Disease 2019 (COVID-19) setting forth criteria to guide evaluation and testing of persons under investigation ("PUI").   Healthcare providers were advised to identify PUI based on clinical features (i.e., fever or signs/symptoms of lower respiratory illness), travel to an affected geographic region and contact with a laboratory confirmed COVID-19 patient.  Persons meeting the PUI criteria were to be tested. See Exhibit "F" to Defendants' RFJN.

On March 4, 2020, CMS issued a memorandum regarding Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes.  Facilities were instructed to screen visitors for international travel, symptoms of respiratory infection, and contact with someone with or under investigation for COVID-19, and to restrict entry of visitors who meet these criteria.  Facilities were advised to screen staff for the criteria as well, and that staff who meet the criteria should not report to work. The CMS guidance also included directions as to when to transfer a resident with a suspected or confirmed COVID-19 infection to a hospital, and under what conditions a nursing home may accept patients diagnosed with COVID-19.  CMS advised facilities to follow the available CDC guidance. See Exhibit "G" to Defendants' RFJN. Defendant followed these directives and the directives issued prior to this, in an effort to assist and help carry out the CDC and CMS' goal of containing and responding to the pandemic.

On March 8, 2020, the CDC issued further Updated Guidance on Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19). The CDC advised that with expanding spread of COVID-19, additional areas of geographic risk were being identified and the criteria for considering testing were being updated to reflect this spread.  The Update indicated that additional COVID-19 testing was becoming available in clinical laboratories pursuant to FDA Emergency Use Authorizations.  With increased access to testing, the criteria for testing had been expanded to include more symptomatic persons. Thus, as part of the coordinated national effort to control and mitigate the spread of the pandemic, the CDC had been specifically directing which persons could be tested.   The

-8-

1   March 8, 2020 updated guidance, also provided detailed instructions for the collecting of specimens.

2   See Exhibit "H" to Defendants' RFJN.

3       On March 10, 2020, CMS issued a memorandum updating the instructions for health care

4   workers involved in the care of patient with known or suspected COVID-19.  The memo addressed the

5   supply, allocation and use of PPE utilized to prevent the spread of the virus including facemasks,

6   respirators, eye protection, medical gowns, gloves and airborne infection isolation rooms. Specifically,

7   the CDC had updated the PPE recommendation for healthcare workers involved in the care of patients

8   with known or suspected CVOVID-19 and that the recommendations would be considered by CMS

9   surveyors to determine if providers were complying with infection control protocols.  The memo

10   advised that facemasks were acceptable temporary alternative when the supply chain of respirators

11   could not meet demand. Healthcare providers were advised that available respirators should be

12   prioritized for procedures that are likely to generate respiratory aerosols, which pose the highest

13   exposure risk to healthcare providers.  See Exhibit "I" to Defendants' RFJN.

14       The March 10, 2020, CMS memo also provided that in the event of a shortage of medical

15   gowns, gowns should also be prioritized for aerosol generating procedures, and that patients with

16   known or suspected COVID-19 should be cared for in a single-person room with the door closed.

17   Airborne infection isolation rooms were to be reserved for patients undergoing aerosol generating

18   procedures.

19       On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency.

20   Following this proclamation, the CDC and CMS took swift action to waive restrictions and expand

21   capacity for healthcare providers and suppliers to coordinate the national response to the nationally

22   declared state of emergency. On March 13, 2020, CMS issued revised infection control and prevention

23   directives for nursing homes to prevent the transmission of COVID-19.   In a memo, facilities were

24   ordered to restrict visitation of all visitors and non-essential health care personnel, cancel communal

25   dining and all group activities, implement   active screening of residents and staff for fever and

26   respiratory symptoms, screen all staff at the beginning of their shift for fever and respiratory symptoms,

27   and identify staff that work at multiple facilities and actively screen and restrict them to ensure they do

28   not place individuals in the facility at risk for COVID-19.  Additional direction was provided regarding

patient transfers and acceptance of patients with COVID-19.   Facilities were ordered to continue to follow applicable CDC guidelines.  See Exhibit "J" to Defendants' RFJN.

On March 17, 2020, the CDC issued documents containing strategies for the optimizing the supply of eye protection, isolation gowns, N95 respirators and face masks.  The documents provided a series of options and specific directives relating to the use PPE based on whether the facility was in conventional capacity (normal operation), contingency capacity (experiencing temporary expected PPE shortages), or crisis capacity (involving periods of known PPE shortages necessitating strategies that are no commensurate with standard U.S. standards of care).

For facilities in contingency capacity, the CDC advised that extended use of facemasks should be implemented and that the use of facemasks should be restricted for use by healthcare providers rather than patients for source control.  During crisis capacity, facilities were to prioritize facemask use for use during activities where prolonged face-to face or close contact with a potentially infectious patient is unavoidable, exclude healthcare providers at higher risk for severe illness from COVID-19 from contact with known or suspected COVID-19 patients, use a face shield with no mask, and in settings where facemasks were not available, use homemade masks. In the document pertaining to optimizing the use of N95 respirators, the CDC advised that (1) if the healthcare provider was to remain 6 feet away from a symptomatic patient, no facemask or N95 respirator was required; (2)  if the healthcare provider was to be within 3 to 6 feet of a symptomatic patient, a facemask should be used; and (3) if the healthcare provider was to be within 3 feet of a symptomatic patient including providing direct patient care, an N95 respiratory should be used if available.  When an N95 respirator was not available, healthcare providers were instructed to wear a surgical mask and exclude healthcare providers at higher risk from severe illness from contact with an infectious patient.  See documents attached collectively as Exhibit "K" to RFJN.

On March 20, 2020, CMS issued a memo entitled Prioritization of Survey Activities.  In the memo, CMS advised that CMS surveyors would be conducting targeted infection control surveys of providers identified in collaboration with the CDC and the HHS Assistant Secretary for Preparedness and Response to ensure providers are implementing actions to protect the health and safety of individuals to respond to the COVID-19 pandemic. See Exhibit "L" to Defendants' RFJN.

On March 21, 2020, the CDC issued further guidance specifically aimed at long term care facilities entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes."  In this publication, nursing homes were advised to restrict visitation, restrict all volunteers and non-essential healthcare personnel, cancel group activities and communal dining, implement active screening of residents and healthcare providers for fever and respiratory symptoms, and make  PPE available in areas where resident care is provided and place a trash can near the exit inside the resident's room so staff can discard PPE prior to exiting.  *The CDC further directed that "residents with known or suspected COVID-19 do not need to be placed in an airborne infection isolation room (AIIR) but should ideally be placed in a private room with their own bathroom.  Room sharing might be necessary if there are multiple residents with known or suspected COVID-19.  As roommates of symptomatic residents might already be exposed, it is generally not recommended to separate them in this scenario."*  [Emphasis added.] See Exhibit "M" to Defendants' RFJN.

On April 2, 2020, CMS issued new guidelines in accordance with the recent CDC directives, which were aimed at long-term care facilities to "mitigate the spread" of COVID-19.  In doing so, CMS noted that "[i]n recent weeks, *CMS and CDC, at President Trump's direction have worked together to swiftly issue unprecedented targeted direction to the long-term care facility industry, including a general prohibition of visitors implemented on March 13, 2020, as well as strict infection control and other screening recommendations.*"  [Emphasis added.]   CMS further noted that long term care facilities were to immediately implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers, vendors, etc.) entering long term care facilities.   See Exhibit "N" to Defendants' RFJN.

On April 2, 2020, CMS ordered facilities to comply with all CMS and CDC guidance related to infection control.   CMS ordered facilities to ensure all staff are using appropriate PPE when interacting with residents to the extent PPE is available and per CDC guidance on the conservation of PPE, and to use separate staffing teams for COVID-19 positive residents to the best of their ability.  See Exhibit N.

In summary, through the federal directives issued by the CDC, CMS, and the CDPH surveyors contracted by CMS, federal authorities were making the operational decisions as it related to the

clinical pandemic response in skilled nursing facilities. Facilities were ordered to restrict visitation, cancel communal dining, implement active screening and staff for fever and respiratory symptoms, screen staff at the beginning of their shift for fever and respiratory symptoms and actively take their temperature and document the absence of shortness of breath and any new or change in cough and sore throat.   Facilities were instructed on which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19. These very detailed clinical directives and instructions represented a marked departure from the regulatory structure which existed before the pandemic.

At all relevant times Redwood Springs was acting at the specific direction of federal authorities to address the on-going federal effort and national state of emergency to contain the COVID-19 pandemic, and prevent the spread of the virus.   All actions taken by the facility in preparation for and response to the COVID-19 pandemic, were taken "in an effort to assist, or help carry out, the duties or tasks" as ordered by the CDC and CMS, and CDPH surveyors (per the contract with CMS), and performed pursuant to the direct orders and comprehensive and detailed regulations issued by CMS. Redwood Springs was acting at the direction of the federal government to prevent, treat and contain COVID-19 at the facility.

**B.      There is a Causal Nexus Between Plaintiffs' Claims and the Actions taken by Defendant Pursuant to Federal Direction**

To establish removal under the federal officer statute, Defendant must also show "a causal nexus between the plaintiff's claims and the defendant's actions under federal direction." *Winters v. Diamond Shamrock Chemical Co*., 149 F.3d 387, 398 (5th Cir. 1998).   Here, Redwood Springs' response to the COVID-19 pandemic as it relates to the claims of Plaintiffs was directly related to the orders and directions issued by the federal government.   There is a clear causal nexus between Plaintiffs' claims and the actions taken by Defendant at the direction of the federal government with respect to the response to the pandemic at the facility and the administration of care to Santiago Gonzalez.

Plaintiffs' specifically allege deficiencies in the use of PPE, delays in COVID-19 testing and failures to isolate infected residents from non-infected residents.  (See Ex. 1- Complaint, pp 5-6, ¶ 16.) On March 8, 2020, the CDC noted that with increased access to testing, the criteria for testing was being expanded to include symptomatic individuals with chronic medical conditions and those over the age of 65, and persons who were in close contact with a laboratory confirmed positive COVID-19 case. Defendant was following the instruction of the CDC with respect to the testing of its staff and residents and was only testing persons meeting the proper criteria. On March 17, 2020, the CDC directed facilities when and under what circumstances to use a facemask or N95 respirator, and how to conserve all types PPE in light of known and ongoing shortages.  Defendant was following these directives in its use of PPE.  On March 21 2020, the CDC directed that "residents with known or suspected COVID-19 do not need to be placed in an isolation room but only in private room with their own bathroom and that room sharing was not necessary as roommates of symptomatic residents might already be exposed and it was not recommended to "separate them in this scenario."  Defendant followed this directive.

The CDC, CMS and CMS state contracted surveyors (the CDPH surveyors), were directing facilities on which patients and staff to test for COVID-19, under what circumstances to use PPE, when to permit staff who had COVID-19 to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19 The nexus element is met as Redwood Springs was following the orders/directives of federal authorities with regard to infection control, COVID-19 testing and the use of PPE.

### C.   Defendants have Raised a Colorable Defense Based on Federal Law

Lastly, Defendant meets the final requirement as they intend to assert colorable federal defenses.   For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The colorable federal defense element is met where a defendant alleges its actions were justified as the defendant was complying with federal directives with respect to the alleged wrongful acts. See *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127 (1989).  See also *Rural Community Workers Alliance v. Smithfield*, 2020 WL 2145350 (W.D. Mo. 2020) finding that compliance with

1    federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil

2    liability.)  Here, Redwood Springs was complying with Federal directives and regulations issued by

3    CMS, CDC and the CMS contracted state surveyors, in responding to all aspects of the COVID-19

4    pandemic.

5        As a colorable defense, Defendant also asserts immunity under the PREP Act as set forth at 42

6    U.S.C. 247d-6d(a)(1).  This Act provides for immunity of "covered persons" from "suit and liability

7    under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or

8    resulting from the administration to or the use by an individual of covered countermeasure."

9    Defendant's immunity defense and the scope of the PREP Act are more fully discussed below.

10        **D.   This Court is not Bound by the Orders issued in *Maglioli* and *Martin***

11       Plaintiffs urge this Court to follow the Orders issued in the *Estate of Maglioli v. Andover Subacute*

12   *Rehab* 2020 Lexis 145055 (D. N.J. August 12, 2020); *Martin v. Serrano Post Acute, LLC*, 2020 Lexis

13   165874 (C.D. Ca. September 10, 2020); and the Kansas cases including *Jackson v. Big Blue*

14   *Healthcare*, 2020 Lexis 150018 (D. KS. August 19, 2020).  First, district court decisions are not

15   binding precedent and need not be followed by other district courts.  Moreover, Notices of Appeal have

16   been filed in *Maglioli* and *Martin*.  A stay of enforcement of the Remand Order in *Maglioli* is currently

17   in effect until October 21, 2020, and a Motion for Stay of the Remand Order pending determination of

18   the Appeal was just filed in *Martin*.  Finally, the Court should also take note that the defendants in the

19   Kansas cases including Jackson, did not remove based on the Federal Officer Removal Statute

20       **IV.  PLAINTIFFS' CLAIMS FALL WITHIN THE PROVISIONS OF THE PREP ACT**

21            **AND THE DECLARATION OF THE HEALTH AND HUMAN SERVICES**

22            **SECREATRY INVOKING THE ACT FOR THE COVID-19 PANDEMIC**

23       Plaintiffs' allegations relate to the Defendant's response to the ongoing COVID-19 pandemic

24   and the administration or use of covered countermeasures (i.e., qualified pandemic products which

25   were used to diagnose, mitigate, prevent, treat or cure COVID-19 including COVID-19 testing kits;

26   masks, and NIOSH approved respiratory protective devices).  While Plaintiffs contend that their claims

27   do not fall within the PREP Act, these allegations by their very nature fall under this law, giving

28   Defendant immunity for all State and Federal claims relating to such countermeasures.

Under the PREP Act, 42 U.S.C. §§ 247d-6d and 247d-6e (2006), Congress has provided immunity from claims as well as exclusive federal jurisdiction for the allegations and relief sought in the Complaint. The legislation empowers the Secretary of Health and Human Services ("HHS") to issue a declaration providing immunity for "covered persons" to suits and liability under federal and state law relating to the administration of a "covered countermeasure" during a health emergency. Specifically, 42 U.S.C. §247d-6d(a)(1) provides as follows: **"Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure."** [Emphasis added.]

On March 10, 2020, HHS Secretary Alex M. Azar issued a Declaration invoking the PREP Act for the COVID-19 pandemic noting that "COVID-19 constitutes a public health emergency for purposes of this Declaration under the PREP Act."  (See Exhibit "A" to Defendants' RFJN). The Declaration was effective as of February 4, 2020.  Secretary Azar subsequently issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020.  See Exhibit "O" to Defendant's RFJN. The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act.  On June 4, 2020, Secretary Azar further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020. See Exhibit "P" to Defendant's RFJN.

The Act is applicable with respect to a "covered countermeasure," which definition includes: "(1) a qualified pandemic or epidemic product (as defined in § 247d-6d (i) (7)) . . . or (4) a respiratory protective device that is approved by the National Institute for Occupational Safety and Health ("NIOSH") and that the Health and Human Service Secretary determines to be a priority for use during a public health emergency declared under section 247d."  42 USC § 247d-6d (i) (1). A "qualified pandemic or epidemic product" is defined as: a drug, biologic product or device that is:

///

"(A)(i) a product manufactured, used, designed, developed, modified, licensed, or procured—
  (I) to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or
  (II) to limit the harm such pandemic or epidemic might otherwise cause;
(ii) a product, manufacture, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious of life-threatening disease or condition caused by a product described in clause (i); or
(iii) a product or technology intended to enhance the use or effect of a drug, biologic product, or device described in clause (i) or (ii); and
(B)(i) approved or cleared under chapter V of the Federal Food, Drug, and Cosmetic Act or licensed under section 262 of this title;
(ii) the object of research for possible use as described in subparagraph (A) and is the subject of an exemption under section 505(i) or 520(g) of the Federal Food, Drug, and Cosmetic Act; or
(iii) authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug and Cosmetic Act." 42 USC § 247d-6d (i)(7)

Robert P. Charrow, General Counsel for the Department of Health and Human Services Office of the Secretary, issued an omnibus advisory opinion[2] to address questions and concerns regarding the scope of the PREP Act immunity for the COVID-19 pandemic. The Opinion summarized the requirements to meet the definition of a qualified pandemic or epidemic product noting that the product:

  (1) must be used for COVID-19; and
  (2) must be
          (a) approved, licensed, or cleared by FDA
          (b) authorized under an EUA [emergency use authorization];
          (c) described in an EUI [emergency use instructions]; or
          (d) used under either an Investigational new Drug (IND) application or an Investigational Device Exemption."

See Exhibit "Q" to Defendants' RFJN, pg. 4, and Exhibit "A" to RFJN -March 10, 2020 Declaration. Attached as Appendix A to the Advisory Opinion is a list of the "covered countermeasures" for which emergency use authorizations have been issued by the United States Food and Drug Administration. (See Exhibit "__" to Defendants' RFJN). The list includes twelve pages of COVID-19 test kits, and provides that face shields, gowns, shoe covers, non-surgical isolation gowns, surgical caps, properly labeled non-surgical masks, and certain non-NIOSH approved respirators are covered by an EUA.

---

[2] Advisory opinions and responsive letters are "entitled to respect." *Christensen v. Harris County*, 529 U.S. 576, 577 (2000).

**MEMORANDUM OF POINTS AND AUTHORITIES**
**Case No. 1:20-cv-01260-NONE-EPG**

Surgical masks are not listed; however, such masks are Class II medical devices which are cleared by the FDA for use.   (See 21 CFR 878.4040). Thus, while Plaintiffs argue in their Opposition that they do not claim decedent's death was caused connected to any "covered countermeasure", COVID-19 testing kits, face masks, gowns, gloves and other PPE are "qualified pandemic or epidemic products" and "covered countermeasures" under the PREP Act, as such products are either FDA cleared/approved or are included in an EUA.

Under the Act, "person" includes "an individual, partnership, corporation, association, entity, or public or private corporation." 42 U.S.C. §247d-6d (i)(2) and (5).  Further, a private sector employer or other person can be a "program planner" when it carries out prescribed activities.  (See page 15199 of the Declaration of Secretary Azar attached as Ex. "A" to Defendant's RFJN.)  The General Counsel for the Office of the Secretary of the Department of Health and Human Services, also recently issued a letter which provides that a "senior living community" meets the definition of a "program planner" to the extent that it supervises or administers a program with respect to the administration, dispensing, distribution, provision or use of a qualified pandemic or epidemic product, including the provision to a facility to administer or use a covered countermeasure. See Exhibit "S" to Defendants' RFJN.

Redwood Springs qualifies as a "covered person" under the PREP Act.  Redwood Springs is a skilled nursing facility licensed by the California Department of Public Health, which employs licensed nursing personnel, including Registered Nurses and Licensed Vocational Nurses, who are authorized to prescribe, administer, or dispense the covered countermeasures (i.e., PPE including facemasks, gloves, gowns, face shields, N95 masks, and COVID-19 testing) under the laws of the State of California. Additionally, Redwood Springs is a program planner that was supervising and administering a program with respect to the administration, dispensing, provision and use of qualified pandemic and epidemic products.

Immunity under the PREP Act "applies to **any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the** . . .  distribution . . . **purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure**." [Emphasis added.] 42 USC § 247d-6d (a)(2)(B).

-17-

This case originates and arises out of Defendant's use, distribution, procurement and administration of covered countermeasures/qualified pandemic products (including COVID-19 testing kits, NIOSH approved respiratory protective devices and other PPE) used to diagnose, mitigate, prevent, treat or cure the COVID-19 virus, or to limit the harm COVID-19 might otherwise thereby triggering application of the PREP Act. Thus, the PREP Act applies and provides immunity to Defendant with respect to Plaintiffs' claims relating to PPE and COVID-19 testing.

Plaintiffs' argue that the PREP Act does not apply to inaction with respect to covered countermeasures citing *Maglioli v. Andover Subactue Rehabilitation Ctr*. 2020 Lexis 145055 at *1 (D. N.J. August 12, 2020), and the *Big Blue Healthcare Cases* including *Lutz v. Big Blue Healthcare*, 2020 Lexis 150018 4815100 (DC Kansas August 19, 2020), in support.   First, as noted above, district court decisions are not binding precedent and need not be followed by other district courts.   Moreover, a Notice of Appeal has been filed in *Maglioli* and a stay of enforcement of this Order has been issued by the New Jersey District Court.[3]   Nonetheless, these District Courts failed to recognize the scope of the Declaration of HHS Secretary Azar and distinguish this declaration from the declaration issued with respect to the H1N1 vaccine.

In his March 10, 2020 Declaration, HHS Secretary Azar notes that the "PREP Act does not explicitly define the term 'administration' but does assign the Secretary the responsibility to provide relevant conditions in the Declaration."   In Section IX of the Declaration[4], Secretary Azar defines "administration of a covered countermeasure" as the "physical provision of the countermeasures to recipients ***or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients***; ***management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures***," [Emphasis added.]   This broad definition of "administration of a covered countermeasure" encompasses plans and decisions with respect to how best to utilize and optimize

---

[3] Plaintiffs also cite *Martin v. Serrano Post Acute, LLC*, 2020 Lexis 165874 (C.D. Cal. September 10, 2020).  However, the Court in Martin did not address the question as to whether claims of inaction are covered under the PREP Act.

**MEMORANDUM OF POINTS AND AUTHORITIES**
**Case No. 1:20-cv-01260-NONE-EPG**

supplies of PPE and COVID-19 testing kits, and whether and when the use of such countermeasures is appropriate.   Defendant's infection control program relating to the use of PPE and dispensing of COVID-19 tests clearly involves the "management and operation of countermeasures programs" or the "management and operation of locations for purpose of distributing and dispensing countermeasures.

The District Courts in *Maglioli* and *Lutz* courts, as well as Plaintiffs, misplace reliance on *Casabianca v. Mount Sinai Medical Center*, 2014 WL 10413521 (N.Y. Sup. Ct. 2014),  in support of their contention that allegations relating to omissions to use covered countermeasures are not covered under the PREP Act.   *Casabianca* involved the H1N1 vaccine, the COVID-19 pandemic.   The Declaration of Health and Human Services Secretary Sebelius invoking the PREP Act for the H1N1 vaccine was much narrower than the Declaration of Secretary Azar with respect to the COVID-19 pandemic.  In fact, the Declaration of Secretary Sebelius and the scope of her declaration for H1N1 is not even referenced by the *Casabianca* Court in its opinion.  The Court instead focused solely on the language of the statute, a significant error on the part of the Court, since it is the Declaration of the HHS Secretary which defines the scope of the immunity and the term "administration of a covered countermeasure" under the PREP Act.  (See Declaration of Secretary Azar, Exhibit "A" to Defendant's RFJN.)

Under the PREP Act, if the HHS Secretary determines that a disease or other health condition or other threat to health constitutes a public health emergency, the Secretary may issue a declaration recommending under conditions as the Secretary may specify, the manufacture, testing, development, distribution, administration or use of one or more covered countermeasures and stating that the immunity in subsection (a) is in effect with respect to the activities recommended.  42 U.S.C. §247d-6d(d)(1).  The activities which are covered and the scope of such activities varies with each public health emergency and declaration.   It is the Secretary's Declaration that is controlling and differs for each public health emergency.

---

[4]  The Declarations of Secretary Azar are entitled to deference under *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-844(1984) , as (1) Congress explicitly left a gap for the agency to fill; and (2) the agency interpretation cannot be shown to be arbitrary, capricious or manifestly contrary to statute.

As noted above, as to COVID-19, the Secretary has declared that the term "administration" includes ***activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures.*** Plaintiffs' claims relate to the management and operation of Defendant's covered countermeasures programs, including decisions as to how best to optimize supplies of PPE and COVID-19 testing kits in light of known regional and national shortages. These decisions and all activities relating to Defendant's covered countermeasures programs are the covered under the PREP Act and Secretary Azar's March 10, 2020 declaration.

Plaintiffs also point to the well-pleaded complaint rule in an attempt to avoid the jurisdiction of this court. In their Opposition, Plaintiffs attempt to re-characterize the allegations in the Complaint and ignore the key allegations in the Complaint regarding COVID-19 testing and PPE. (See Plaintiffs' Complaint, pgs. 5-6, ¶ 16.) However, "an 'independent corollary' to the well-pleaded complaint rule is the further principle that 'a plaintiff may not defeat removal by omitting to plead necessary federal questions.'" *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998) "[C]ourts will not permit plaintiff to use artful pleading to close of defendant's right to a federal forum." *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 397, n. 2 (1981).

There is no question as to what this case is about: the extent to which countermeasures were utilized and administered by Defendant at Defendant's facility and whether this caused or contributed to the death of Santiago Gonzalez[5]. In addition to Plaintiffs' specific claims about PPE and COVD-19 testing, even claims seemingly unrelated to such covered countermeasures, have a "causal relationship" to the administration of covered countermeasures. See 42 USC §247d-6d(a)(2)(B). Plaintiffs contend that Defendants failed to timely test other residents in order to timely isolate and separate the infected individuals from non-infected individuals. These claims all fall within Defendant's COVID-19 testing program, for which Defendant is afforded immunity under the PREP Act.

---

[5] While Plaintiffs' claim in their Opposition that their allegations relate to failures to act, the Complaint specifically alleges delays in COVID-19 testing, and provides that Mr. Gonzlaez was tested for COVID-19 on April 3, 2020.

## V.  REMOVAL IS APPROPRIATE AS FEDERAL COURTS HAVE EXCLUSIVE JURISDICTION UNDER THE PREP ACT

"The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."  28 U.S.C. § 1331.  Federal courts have "jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action *or* that the plaintiff's

right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif.*, 463 US 1, 27-28 (1983); *Dennis v. Hart* 724 F.3d 1249, 1253 (9th Cir. 2013) *Rivet v. Regions Bank of Lousiana*, 522 US 470, 475 (1998).

Complete preemption exists when the preemptive force of federal law is so powerful that it displaces any state law cause of action, and leaves room only for a federal claim for purposes of the "well-pleaded complaint" rule. *Metropolitan Life Ins. Co. v. Taylor* (1987) 481 US 58, 63-64.  Complete preemption exists when a federal statute (1) manifestly preempts the state law claim; and (2) creates an exclusive federal remedy.  *Beneficial National Bank v. Anderson*, 539 U.S. 1, 8 (2003).

Here, the PREP Act provides that "a covered person shall be immune from suit and liability under . . .  State law with respect to all claims" relating to a covered countermeasure.  The PREP Act further explicitly provides as follows:

> "During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
> (A) is different from, or is in conflict with, any requirement applicable under this section; and
> (B) relates to the . . . distribution, sale, donation, purchase  . . . or the prescribing, dispensing or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter. . . "

This clear and direct preemption of state law claims satisfies the first prong of the *Beneficial* test.

The PREP Act further creates an exclusive federal remedy, thereby meeting the second prong required under *Beneficial*. The PREP act was designed to apply to individuals and entities responding

to public health emergencies, and provides immunity for claims involving "covered countermeasures" under the Act.  The sole exception to the immunity from suit and liability (other than actions by and against the United States) provided by the Act, is "for an exclusive Federal cause of action against a covered person for death or serious injury proximately caused by willful misconduct."  42 U.S.C. §§247d-6d(d)(1) and (e)(1).

The statute sets forth the procedures for suit, which must be filed in the US District Court for the District of Columbia. 42 U.S.C. §247d-6d(e)(1), including requirements for pleading with particularity, verification of and submission of physician declaration in support of the Complaint, and assignment of the action to a three-judge panel which shall have jurisdiction to consider motions to dismiss, and motions for summary judgment. Moreover, §247d-6d(e)(10), the "*United States Court of Appeals for the District of Columbia Circuit shall have jurisdiction of an interlocutory appeal by a covered person taken within 30 days of an order denying a motion to dismiss or motion for summary judgment based on an assertion for the immunity from suit conferred by subsection (a) or based on an assertion of the exclusion under subsection (c)(5)*." [Emphasis added.]

For claims barred pursuant to the immunity under 42 U.S.C. §247d-6d that do not assert "willful misconduct," the exclusive remedy for relief is established under §247d-6e, which permits an individual to make a claim for a "covered injury directly caused by the administration or use of a covered countermeasure."  Even a claimant alleging "willful misconduct" must first apply for benefits under §247d-6e before filing an action under §247d-6d (d) relating to the "willful misconduct" thus further illustrating Congress' intent for the Act to cover all claims related to a "covered countermeasure."

Congress has clearly manifested the intent to preempt state law with respect to claims that invoke PREP Act immunity, and has created an exclusive federal remedy for such preempted claims.

The New York state appellate court in *Parker v. St. Lawrence County Public Health Dept*., 102 A.D.3d 140 (N.Y. App. Div. 2012) addressed the issue of Federal preemption for PREP Act claims and correctly found that federal law did preempt the plaintiff's state law claims for negligence and battery arising from the administration of the H1N1 vaccine without consent.   The Court in *Parker* ruled that the PREP Act contains an express preemption clause and that this plain reading was the best evidence

of Congress' intent with regard to preemption.  *Id*.  The Court found that the clear language that "no State . . . may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that . . . (A) is different from, or is in conflict with, any requirement applicable under this section; and (B) relates to the . . . use, . . . dispensing, or administration by qualified persons of the covered countermeasure." *Id*.

The *Parker* Court reasoned that "[s]ince State regulations can be as effectively exerted through an award of damages as through some form of preventative relief, state common-law tort claims may be preempted along with State statutes and regulations. *Id*. at 143, citing *Riegel v. Medtronic, Inc.*, 552 U.S. at 324 (2008).  Finally, the Court concluded that "Congress intended to preempt all state law tort claims arising from the administration of covered countermeasures by a qualified person pursuant to a declaration by the Secretary" and that this extended beyond mere administration to include questions of informed consent. *Id*.  Even though the Secretary's Declaration for H1N1 was more narrowly drafted than the COVID-19 declaration, on the broader issue of preemption, the *Parker* court still found the PREP Act preempted the plaintiff's state law claims, and dismissed plaintiffs' claims for lack of subject matter jurisdiction.

The plain language of the PREP Act, and supporting case law, make clear that complete preemption and exclusive federal jurisdiction exists for this matter. A state court has no jurisdiction to hear or consider the claims which relate to covered countermeasures under the PREP Act.  Congress further set up civil enforcement provisions with exclusive federal jurisdiction which provide a specific federal forum for actions arising from alleged "willful misconduct" and the rules for adjudicating such claims.   Thus, The PREP Act provides for exclusive federal jurisdiction over Plaintiffs' state law claims.

## VI.  THIS CASE RAISES A SUBSTANTIAL AND IMPORTANT FEDERAL ISSUES REQUIRING THE COURT TO RETAIN JURISDICTION

The absence of an express federal claim is not necessarily fatal to jurisdiction for cases "arising under" federal law.  Federal question jurisdiction over state law claims may be sustained if the claims present a substantial, imbedded question of federal law. *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 808 (1986).  In *Grable & Sons Metal Products v. Darue Engineering & Mfg*,

-23-

545 U.S. 308 (2005), the United States Supreme Court held that removal is appropriate if (1) the state law claim necessarily raises a disputed and substantial issue; and (2)  a federal court may entertain the claims without disturbing federal/state comity principles. *Id*. at 314.

Here, both prongs under *Grable* are satisfied.  This case involves issues of national importance, which present issues of first impression.  While Plaintiffs do allege State causes of action, their claims relate to the Defendant's response to a national public health state of emergency, which has not been seen by this Country in over a century.  The healthcare response to this pandemic was coordinated at a national level by the Department of Health and Human Services, the CDC, the FDA and CMS, and entailed the issuance of detailed directives to healthcare providers to identify and sequester infected patients, which patients under investigation were to be tested, and the use of personal protective equipment. Plaintiffs Complaint raises issues with respect to the procurement, use, allocation, distribution and administration of PPE and COVID-19 testing, which invoke a substantial federal question regarding whether the broad immunities afforded under the PREP Act apply to the conduct of Defendant.  It is premature for Plaintiffs to ask the Court to remand the case before the Court decides the merits as to whether the PREP Act immunities apply to the claims in the Complaint.

The application of the PREP Act raises a substantial federal issue which is disputed.  The allegations in the Complaint arise out of Defendant's response to the COVID-19 pandemic and are inextricably intertwined with and invoke the PREP Act and the Declarations of the Health and Human Services Secretary.

The Federal Court has a substantial interest in determining the application of the PREP Act in this matter.  The PREP Act and its triggering immunity, has been invoked in exceptionally rare circumstances since it was enacted in 2005.  The PREP Act and HHS Secretary Azar's declarations confer a broad and sweeping immunity to individuals and entities fighting the COVID-19 pandemic during this declared state of emergency.  The unique character of the COVID-19 virus, the present lack of a vaccine, as well as its high communicability required Secretary Azar to set forth an expansive declaration covering broad categories of measures to fight the pandemic including COVID-19 testing and PPE, all of which require interpretation as to the scope and application.  Thus, there can be no doubt that there is a substantial and compelling interest for the PREP Act and the Secretary's

-24-

declaration to be interpreted by the Federal Courts. Moreover, the Federal Court is uniquely and properly positioned to interpret Congressional intent and interests of the federal government.

Turning to the second prong set forth in Grable, the Court would not "disturb any congressionally approved balance of federal and state judicial responsibilities" by retaining jurisdiction in this matter.  The PREP Act expresses a strong federal interest and a clear intention to supersede or preempt state control of the issues raised by Plaintiffs' Complaint.

Congress did not intend the application of PREP Act immunity to be decided by State Courts. As such, this Court would not be disturbing or infringing on any balance of State and Federal judicial responsibilities by retaining jurisdiction.  To the contrary, the plain language of the statute seeks to assert broad federal authority over the issues arising under the Act, and seeks to eliminate all semblance of State Court control.

**VII.  CONCLUSION**

For all of the foregoing reasons, the Court should deny Plaintiffs' Motion and maintain jurisdiction in this case.   In the event that the Court grants Plaintiffs' motion, it is requested that any ruling against Defendant on the issue of the applicability of the PREP Act be without prejudice, as discovery will reveal that covered countermeasures (PPE and COVID-19 testing) were utilized by Defendant thereby entitling Defendant to immunity under the PREP Act.

Dated:  October 19, 2020                        WILSON GETTY LLP


                                                        By:  ___/s/ Kim S. Cruz_____

                                                                William C. Wilson
                                                                Kim S. Cruz
                                                                Ryan Canavan

                                                        Attorneys for Defendant SPRUCE HOLDINGS, LLC dba
                                                        REDWOOD SPRINGS HEALTHCARE CENTER

_**Jamie Gonzalez, individually and as SII to the Estate of Santiago Gonzalez, deceased, et. al. v.**_
_**Redwood Springs Healthcare Center, et. al.**_
**United States District Court, Eastern District of California**
**Case No.**
**\*\*\***
**PROOF OF SERVICE**

I am employed in San Diego County.  I am over the age of 18 and not a party to this action.  My business address is 12555 High Bluff Drive, Suite 270, San Diego, California 92130.

On **September 25, 2020**, I served the foregoing documents, described in this action as:

- **DEFENDANT, SPRUCE HOLDINGS, LLC dba REDWOOD SPRINGS HEALTHCARE CENTER'S NOTICE OF MOTION AND MOTION TO DISMISS (FRCP 12(b)(6)) and MOTION TO STRIKE (FRCP 12(f)) PORTIONS OF PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

As follows:

Warren R. Paboojian, Esq.
Jason S. Bell, Esq.
Baradat & Paboojian, Inc.
720 West Alluvial Avenue
Fresno, CA 93711
T: 559.431.5366
F: 559.431.1702
Email: wrp@bplaw-inc.com
Email: jsb@bplaw-inc.com

**[X]     By CM/ECF ELECTRONIC DELIVERY:**     In accordance with the registered case participants and in accordance with the procedures set forth at the Court's website www.ecf.cacd.uscourts.gov.

**[X]**     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **September 25, 2020** at San Diego, California.

Tonya Jamois